The EMPIRE SAVINGS, BUILDING AND LOAN ASSOCIATION, Plaintiff-Appellee,

v.

OTERO SAVINGS AND LOAN ASSOCIATION, Defendant-Appellant,

and

The State of Colorado, Intervenor.

No. 81SA30.

Supreme Court of Colorado, En Banc.

Feb. 16, 1982.

Calkins, Kramer, Grimshaw & Harring, James S. Bailey, Denver, for plaintiff-appellee.

Law, Scheid & Farabee, Jeffrey L. Beattie, Denver, for defendant-appellant.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Deanna E. Hickman, Asst. Atty. Gen., Denver, for intervenor.

LOHR, Justice.

The sole issue raised by this appeal is whether Colo.Sess.Laws 1980 ch. 52, 5–3–105 at 444 (Senate Bill 20) is unconstitutional because it was not encompassed by the Governor's call to the legislature as required by *Colo.Const.* Art. V, § 7. In this declaratory judgment action, the trial court determined that Senate Bill 20 met that constitutional requirement and granted summary judgment for the plaintiff, The Empire Savings, Building and Loan Association (Empire). The defendant, Otero Savings and Loan Association (Otero), then brought this appeal.[1] We affirm.

## I.

The facts underlying the present suit are not disputed by the parties. On June 25, 1980, Empire sold Otero a number of first mortgage home loans pursuant to a "Whole Loan Sales and Service Agreement."[2] This agreement contained a warranty by Empire that the mortgages complied with applicable state and federal law in all respects.

---

1. The State of Colorado filed a motion to intervene in this action while it was pending before this court. The motion was granted and a brief was submitted. *See* section 13–51–115, C.R.S. 1973; C.R.C.P. 57(j). The brief of the state supports Empire's contention that Senate Bill 20 is constitutional.

2. Each loan is evidenced by a promissory note secured by a deed of trust. For ease of exposition, the loans are referred to as the "mortgages" or "loans."

Otero's remedy for breach of this warranty was limited to the right to require Empire to repurchase any non-conforming loans.

On August 8, 1980, Otero demanded that Empire repurchase the loans. Each mortgage sold by Empire to Otero contained provisions which allow the lender to assess a penalty if installments are not timely paid or if the loan is paid before the due date. Otero contended that the prepayment penalty and the late fee provision violated sections 5-3-202, 209, C.R.S.1973 (1981 Supp.) of the Uniform Consumer Credit Code (UCCC). Although Otero acknowledged that Senate Bill 20 exempts these mortgages from the coverage of the UCCC, it maintained that the bill was void because it was outside the scope of the Governor's call to the General Assembly.

Empire rejected Otero's demand to repurchase the loans, and brought a C.R.C.P. 57 action in district court seeking a declaratory judgment that Senate Bill 20 is constitutional. The parties filed cross-motions for summary judgment, contending that there were no genuine issues of material fact and that the only question to be resolved was the constitutionality of Senate Bill 20. The trial court determined that a resolution by summary judgment was appropriate, and concluded that Senate Bill 20 was within the scope of the Governor's call. It consequently granted Empire's motion for summary judgment and denied the cross-motion of Otero. This appeal followed.

## II.

As an aid to understanding the arguments of the parties in this case, it is helpful at the outset to review the relevant provisions of the UCCC and the background of Senate Bill 20.

The UCCC applies only to "consumer loans." At the time relevant to this case, consumer loans were defined in section 5-3-104 of the UCCC as follows:

(1) Except as provided in subsection (2) of this section and except with respect to *a loan primarily secured by an interest in land* (section 5-3-105), "consumer loan" is a loan made or arranged by a person regularly engaged in the business of making loans in which:

(a) The debtor is a person other than an organization;

(b) The debt is incurred primarily for a personal, family, household, or agricultural purpose;

(c) Either the debt is payable in instalments or a loan finance charge is made; and

(d) Either the principal does not exceed twenty-five thousand dollars or the debt is secured by an interest in land. (Emphasis added.)[3]

It is uncontested that the loans sold by Empire to Otero meet the requirements of this definition unless they are excluded by the exception for loans "primarily secured by an interest in land." This exception is defined in section 5-3-105 of the UCCC.

Prior to 1979, section 5-3-105 prescribed a two-part test to determine if a loan was excepted from the UCCC definition of consumer loan because that loan was primarily secured by an interest in land. In order to qualify for the exception, the test required that, at the time the loan was made: (1) the value of the land used as collateral be substantial in relation to the amount of the loan, and (2) that the loan finance charge[4] not exceed 12% per year when calculated by the method prescribed in the statute. When first adopted, the effect of this exception was to exclude most first mortgage loans on dwellings from the provisions of the UCCC.

However, rising interest rates caused the exception to become increasingly limited in application. Apparently in response to this trend, the legislature amended section 5-3-105 in 1979 by increasing the permissible loan finance charge ceiling from 12% to 13% for loans executed on or after July 1, 1979,

---

**3.** The definition of "consumer loan" in section 5 3 104 was subsequently amended. Colo. Sess.Laws 1981 ch. 70, 5-3-104 at 388.

**4.** The "loan finance charge" is defined to include interest and certain other loan charges. Section 5-3-109(1), C.R.S.1973.

but no later than July 1, 1981. Colo.Sess. Laws 1979, ch. 52, 5–3–105 at 310.

In 1980 the legislature again turned its attention to section 5–3–105. Recognizing that an approach based on a fixed ceiling for loan finance charges was inappropriate because of the volatile condition of the financial markets, the legislature adopted Senate Bill 20. Rather than again adjusting the maximum permissible loan finance charge, it provided that, regardless of the rate of the loan finance charge, a loan secured by a first mortgage or deed of trust lien against a dwelling to finance the acquisition of that dwelling or to refinance an existing loan made for that purpose is excluded from the UCCC. Colo.Sess.Laws 1980, ch. 52, 5–3–105 at 444.[5]

Otero agrees that if Senate Bill 20 is valid the trial court's summary judgment in favor of Empire was proper. It argues, however, that Senate Bill 20 is void because it was not encompassed by the Governor's call. It is to this argument we now turn.

### III.

As relevant here, *Colo.Const.* Art. V, § 7 restricts the subject matter which may be considered by the Colorado General Assembly in even-numbered years to those matters submitted by the Governor in writing during the first ten days of the session.[6] At the 1980 session, the Governor submitted two items for legislative consideration relevant to the subject matter of Senate Bill 20:

Item 5. "Concerning housing."

Item 40. "Concerning the exclusion from the definition of 'consumer loan' in

---

**5.** Section 5–3–105, as it appeared following its 1980 amendment, is reproduced in full below. That portion added by Senate Bill 20 is denoted by capitalization.

Unless the loan is made subject to this code by agreement (section 5–3–601) and except as provided with respect to disclosure (section 5–3–301) and debtors' remedies (section 5 5 -201), "consumer loan" does not include a "loan primarily secured by an interest in land", if at the time the loan is made the value of this collateral is substantial in relation to the amount of the loan, and THE RATE OF the loan finance charge does not exceed twelve percent per year calculated according to the actuarial method on the unpaid balances of the principal on the assumption that the debt will be paid according to the agreed terms and will not be paid before the end of the agreed term or does not exceed thirteen percent per year, calculated in the same manner, if the loan is executed on or after July 1, 1979, but no later than July 1, 1981, OR, NOTWITHSTANDING THE RATE OF THE LOAN · FINANCE CHARGE, THE LOAN IS SECURED BY A FIRST MORTGAGE OR DEED OF TRUST LIEN AGAINST A DWELLING TO FINANCE THE ACQUISITION OF THAT DWELLING OR TO REFINANCE AN EXISTING LOAN MADE FOR THAT PURPOSE. FOR THE PURPOSES OF THIS SECTION, A "LOAN SECURED BY A FIRST MORTGAGE OR DEED OF TRUST LIEN AGAINST A DWELLING TO FINANCE THE ACQUISITION OF THE DWELLING" INCLUDES A LOAN SECURED BY A FIRST MORTGAGE OR DEED OF TRUST LIEN AGAINST A DWELLING TO FINANCE THE ORIGINAL CONSTRUC-

TION OF SUCH DWELLING OR TO REFINANCE ANY SUCH CONSTRUCTION LOAN, "DWELLING" MEANS ANY IMPROVED REAL PROPERTY, OR PORTION THEREOF, THAT IS USED OR INTENDED TO BE USED AS A RESIDENCE AND CONTAINS NOT MORE THAN FOUR DWELLING UNITS, AND "FIRST MORTGAGE OR DEED OF TRUST" MEANS A MORTGAGE OR DEED OF TRUST HAVING PRIORITY AS A LIEN OVER THE LIEN OF ANY OTHER MORTGAGE OR DEED OF TRUST ON THE SAME DWELLING AND SUBJECT TO THE LIEN OF TAXES LEVIED ON THAT DWELLING.

Section 5–3–105 was repealed and reenacted by the legislature in 1981. Colo.Sess.Laws 1981, ch. 70, 5–3–105 at 389. The present version, still substantially similar to that quoted above, is found at section 5–3–105, C.R.S.1973 (1981 Supp.). Since the 1981 legislation was subsequent to the transaction at issue here, it is not material to the present case.

**6.** *Colo.Const.* Art. V, § 7 provides in pertinent part:

The general assembly shall meet in regular session at 10 o'clock a. m. on the first Wednesday after the first Tuesday of January of each year. At such regular sessions convening in even-numbered years, the general assembly shall not enact any bills except those raising revenue, those making appropriations, and those pertaining to subjects designated in writing by the governor during the first ten days of the session.

Empire does not contend that Senate Bill 20 is a revenue-raising or appropriations measure.

Colorado Revised Statutes 1973, 5–3–105, as amended, of any first mortgage loan made by a 'supervised financial organization,' as defined in Colorado Revised Statutes 1973, 5–1–301(17), to finance or refinance the construction or acquisition of a dwelling." [7]

Item 5 was part of a list of 31 items submitted to the General Assembly by the Governor's written message of January 4, 1980. Item 40 was contained in a second message to the General Assembly, submitted by the Governor on January 11, 1980, listing 132 independently numbered call items. The district court concluded that Item 5 and Item 40 each provided an independent basis for passage of Senate Bill 20 in compliance with the requirement of Art. V, § 7 of the Colorado Constitution. We agree.

█ In determining whether legislation meets the requirements of *Colo.Const.* Art. V, § 7, the test is whether the challenged legislation bears a "rational nexus" to an item specified in the Governor's call. *People v. Larkin*, 183 Colo. 363, 517 P.2d 389 (1973). In *People v. Larkin*, we considered the constitutionality of a statute making it a felony for a person to possess an explosive device and to use, intend to use, or cause the use of such a device for an unlawful purpose. This legislation was passed in response to the Governor's call for "legislation concerning safety inspection by the Division of Labor of the Department of Labor and Employment." The same act containing the challenged provision charged the Division of Labor with monitoring the manufacture, sale, transportation, storage, and use of explosives. We found that there was no rational nexus between the challenged criminal statute and the safety inspections designated by the Governor and consequently held that the criminal statute was void. We noted, however, that the legislature acted within the scope of the Governor's designation when it provided for the issuance of permits by the Department of Labor for the manufacture, sale, transportation, storage, and use of explosives, and when it created criminal sanctions for the failure to obtain such a permit before engaging in those activities. While the latter provisions contained a rational nexus to the Governor's call, the felony statute lacked that link.

Thus, under *Larkin*, the General Assembly is not limited to a narrow, technical interpretation of the subject matter comprised in the Governor's call, but a speculative, indirect, and tangential relationship between legislation and the call item on which it is based will be insufficient. It is between these extremes, by use of the "rational nexus" construct, that the line defining the limits of permissible legislative action is to be drawn.

### A.

█ Turning to the present controversy, we conclude that Senate Bill 20 has a "rational nexus" to the Governor's request for legislation, Item 5, "concerning housing." Otero's arguments to the contrary are unpersuasive.

Otero first contends that Senate Bill 20 and the Governor's designation "concerning housing" have the indirect and tangential relationship condemned in *Larkin*. It contends that, if Senate Bill 20 is upheld on this basis, legislation concerning the manufacture of bricks, the forced purchase of water meters, and the busing of school chil-

---

7. Item 41 of the Governor's call directs the legislature to consider a limited expansion of the definition of "supervised financial organization." It provides:

> Expanding the definition of "supervised financial organization" in Colorado Revised Statutes 1973, 5–1–301(17), to include an FHA approved mortgagee or a mortgage lender registered with the savings and loan division whose tax and insurance escrow accounts have been satisfactorily examined by the savings and loan division, or satisfac-

torily audited by an independent certified public accountant approved by the savings and loan division.

Empire quotes Item 41 of the Governor's call, but does not further explain its relevance to a resolution of the present case. We do not find item 41 material to our determination of the question presented, although it is informative on the scope and specificity of the contemplated first mortgage loan exclusion described in Item 40.

dren could be similarly sustained. Without expressing any view on whether Otero's hypothetical examples would meet the "rational nexus" requirement, we think it sufficient to note that first mortgage residential financing has a direct and important connection to the availability and quality of housing. This is not a case where the legislature has acted on a subject that may or may not be connected with the housing market and whose effect on that market would be indirect at most. Residential financing is by its nature tied to housing construction and sale, and the availability of suitable financing is often the controlling factor determining whether an adequate supply of homes will be available.[8]

Otero also contends that the Governor's call must be read as a whole, and that Item 40, which assertedly is too narrow to sustain Senate Bill 20, must be read as a limitation on the scope of permissible legislative action under Item 5. We are not persuaded that such a construction of the call is correct.

Had the Governor intended to limit the legislature's action under Item 5, it seems logical that this limitation would have been expressed in Item 5 or in another call item making reference to Item 5 or its subject matter. In fact, Item 5 was submitted in the Governor's message of January 4, 1980, while Item 40 was the subject of a second message, submitted on January 11, 1980, containing an independently numbered set of call items.

Moreover, as a general matter, we do not consider it appropriate to construe the Governor's call in such a limiting fashion. If the Governor does not wish to open a broad area of legislative action, he may structure the call narrowly in the first instance. Here, the Governor has elected to describe broadly the subject which the legislature may consider. We may not properly restrict the scope of that subject by applying traditional statutory construction principles to a list of call items bearing no necessary or apparent relation to each other.

### B.

We also find that Item 40 of the Governor's call provides an independent basis to sustain Senate Bill 20. Otero argues that the scope of the subject described in Item 40 is limited to excluding from the consumer loan definition in the UCCC only those first mortgage loans made by a "supervised financial organization." Because Senate Bill 20 excludes qualifying loans made by other lenders, Otero argues that the General Assembly exceeded the scope of the subject authorized for legislative consideration by Item 40 and so acted in excess of its powers. We disagree with this contention.

We have previously addressed arguments similar to that raised by Otero in the context of the Governor's power to prescribe the subject matter to be considered by the legislature at a special session called pursu-

8. In connection with its argument on this point, Otero cites *Denver and Rio Grande Railroad Co. v. Moss*, 50 Colo. 282, 115 P. 696 (1911). In that case, the Governor's proclamation read:

" 'To enact any and all legislation relating to or in any wise affecting corporations, both foreign and domestic, of a *quasi*-public nature.' "

50 Colo. at 284, 115 P. at 696.

Pursuant to this call, the legislature adopted a statute imposing absolute liability on railroads for the killing of livestock. The court found that the call was defective because too broad, and held that the legislation passed in response to it was void. On the basis of *Moss*, it might be argued that the present call "concerning housing" is also impermissibly broad. We find the *Moss* case distinguishable. The defect which the court found objectionable in *Moss* was the failure to specify *any* subject matter for legislation: "On the contrary, [the Governor] simply pointed out a certain class of artificial persons, concerning which there might be legislation, and left the General Assembly a free rein to legislate in reference to them at will .... [H]e specifically pointed out the persons ... to be affected, but not the special business or subject-matter of legislation." 50 Colo. at 285, 115 P. at 697. In contrast, the call in the present case, although broad, specifies the subject-matter to be considered rather than simply the class of persons to be affected. Moreover, even if *Moss* were applicable, that decision has been criticized, 1 Sands, *Sutherland's Statutory Construction*, § 5.04 (4th ed. 1972), and we would not necessarily follow its lead.

ant to *Colo.Const.* Art. IV, § 9.[9] We find the approach adopted in that analogous situation applicable to the present dispute.

In *People ex rel. McGaffey v. District Court*, 23 Colo. 150, 46 P. 681 (1896), the Governor called a special session to enact amendments to the state's Australian Ballot Law. In his proclamation, he proposed a specific set of amendments for legislative consideration. The legislature's subsequent amendment of the ballot law was challenged on the basis that it exceeded the scope of the Governor's specific directions. We held:

> The governor, by specially designating ... the "Australian Ballot Law," for amendment, must be held to have submitted the whole subject-matter of such act for legislative action thereon. He had no more authority to go farther than this, and specify the particular character of the amendments that were to be voted upon, than he would have had to have prepared the bills, and attached them to his call, and directed the legislature to have passed or rejected the same without amendment. Such specific instructions can, at best, be regarded as advisory only, and not as limiting the character of legislation that might be had upon the general subject of the Australian ballot law.

23 Colo. at 152, 46 P. at 681.

A similar issue was raised in *In Re Amendments*, 19 Colo. 356, 35 P. 917 (1894), where the Governor's call requested the legislature to consider a provision "to reduce the penalties and interest on delinquent taxes to one-half the present rates." We held that specification of the amount by which the rates were to be reduced was merely advisory, and that the legislature was not bound by the figure "one-half" in its consideration of appropriate penalty and interest reduction legislation. Two other cases similar in effect to those discussed above, are *Parsons v. People*, 32 Colo. 221, 76 P. 666 (1904) and *In Re Governor's Proclamation*, 19 Colo. 333, 35 P. 530 (1894).

The principle to be derived from these cases is that the Governor may define the appropriate subject matter for legislative consideration, but he may not prescribe the specific form that the legislation will take. As stated by this court in *In Re Governor's Proclamation, supra*, the Governor cannot so narrow the matter for legislative consideration that the General Assembly is forced "to do the bidding of the governor, or not act at all." 19 Colo. at 336, 35 P. at 531.

Nor is this principle derived solely from an interpretation of the Governor's prerogatives under Art. V, § 7 and Art. IV, § 9 of the Colorado Constitution. Our interpretation of the Governor's authority under those provisions is also influenced by recognition that the task of formulating specific legislation is constitutionally committed to the General Assembly, and that the Governor's authority to set the legislative agenda is an exception to the normal separation of powers mandated by *Colo. Const.* Art. III. Consequently, the Governor's authority to prescribe the matters for legislative action must be reasonably interpreted so as not to offend the separation of powers requirement. *See People v. McKenna*, 199 Colo. 452, 611 P.2d 574 (1980); *In Re Governor's Proclamation, supra.*

Applying the above principles to the present case, we conclude that the legislature was not limited to excluding only qualifying loans made by "supervised financial organizations" from the UCCC. The language in Item 40 referring to these organizations was merely advisory, and not a limit on the scope of permissible legislative action. The legislature dealt with the subject matter prescribed by the Governor, *i.e.*, broadening the scope of the mortgage loan exception to the UCCC definition of consumer loan. We hold that Senate Bill 20 was within the scope of Item 40 of the call.

---

**9.** *Colo.Const.* Art. IV, § 9 provides:

> The governor may, on extraordinary occasions convene the general assembly, by proclamation, stating therein the purpose for which it is to assemble; but at such special session no business shall be transacted other than that specially named in the proclamation. He may by proclamation, convene the senate in extraordinary session for the transaction of executive business.

Having concluded that Senate Bill 20 was properly enacted under both Item 5 and Item 40 of the Governor's call to the General Assembly, we affirm the trial court's order granting summary judgment for Empire.

DUBOFSKY, J., concurs in part and dissents in part.

DUBOFSKY, Justice, concurring in part and dissenting in part:

I concur with the majority opinion except for Part III–B, from which, respectfully, I dissent.

The majority position in Part III–B is grounded on the proposition that the Governor's authority to prescribe the matters for legislative action must be interpreted so as not to offend the doctrine of separation of powers. *Colo.Const.* Art. III provides:

"The powers of the government of this state are divided into three distinct departments—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, *except as in this constitution expressly directed or permitted.*"

(Emphasis added.) *Colo.Const.* Art. V, Sec. 7 (set forth in footnote 6 of the majority opinion), limiting legislative consideration at sessions convened in even-numbered years to revenue raising and appropriations bills and bills pertaining to subjects designated in writing by the Governor during the first ten days of the session, is one of the exceptions. *See People v. McKenna*, 199 Colo. 452, 611 P.2d 574 (1980).

Colorado is one of several states with regularly scheduled limited-purpose legislative sessions mandated by its constitution. 1 Sands, *Sutherland's Statutory Construction*, § 5.01 (4th ed. 1972). These constitutional provisions are described as

"intended to be a limitation on the power of the legislature, and not upon the power of the governor.

.  .  .  .  .

Since the governor can either restrict the scope of legislative action, or can extend it to many subjects, it should make no difference whether the language he uses describes the subjects by general language, or by language designating in minute detail the subjects he believes to need attention."

*Id.* § 5.04 at 129. Because the Governor's power to describe the subjects at limited-purpose legislative sessions is, as the majority correctly notes, "an exception to the separation of powers mandated by *Colo. Const.* Art. III" (maj. op. at 1157). I believe that the Governor should be able to define the appropriate subject matter for legislative consideration as he did in Item 40 (set forth on page 1154 of the majority opinion).

The subject of Item 40 is exemption from the UCCC of first home mortgage loans made by supervised financial organizations. A comparison of the item with the legislation adopted (set forth in footnote 5 of the majority opinion) illustrates that the Governor did not, as the majority finds, "prescribe the specific form that the legislation will take." The General Assembly addressed several details not specified in Item 40, including the definition of dwelling and the exclusion from a limitation on the rate of the loan finance charge if the loan was exempt.

Telling the Governor that he may not prescribe the specific form that legislation will take, on the facts of this case, will leave the Governor in doubt as to what specifics he may ever prescribe. To me, the effect of Part III–B will be to preclude the Governor from writing narrow call items. Such an effect is contrary to the approach of our cases which have invalidated legislation because it is beyond the scope of a narrow call item. *People v. Larkin*, 183 Colo. 363, 517 P.2d 389 (1973); *In re Interrogatories of Senate*, 94 Colo. 215, 29 P.2d 705 (1934).

The majority's conclusion that Item 5 supports the legislation resolves the matter before us; I would not reach Item 40.